Case: 4:14-cv-01833-AGF   Doc. #: 1   Filed: 10/29/14   Page: 1 of 31 PageID #: 1

Timothy Coffield, Attorney (Virginia State Bar No. 83430)
5374 Gordonsville Road
Keswick, VA 22947
Telephone: 434-218-3133
Email: tc@coffieldlaw.com

RECEIVED nd Proposed Class

OCT 29 2014

BY MAIL

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
ST. LOUIS DIVISION

MARK BOSWELL
and
DAVID LUTTON,
individually, and on behalf of
all others similarly situated,

Case No.

Plaintiffs,

v.

**COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF**

PANERA BREAD COMPANY,
a Delaware Corporation,

**CLASS ACTION**
DEMAND FOR JURY TRIAL

PANERA LLC,
a Delaware Limited Liability Company,

Defendants.

TABLE OF CONTENTS

I.      SUMMARY OF ACTION ............................................................................................ 1
II.     JURISDICTION AND VENUE................................................................................... 3
III.    INTRADISTRICT ASSIGNMENT ........................................................................... 4
IV.     CHOICE OF LAW .................................................................................................... 4
V.      PARTIES ................................................................................................................... 5
        A. PLAINTIFFS ....................................................................................................... 5
        B. DEFENDANTS .................................................................................................. 6

VI.     CLASS ACTION ALLEGATIONS.............................................................................. 6
VII.    FACTS COMMON TO ALL COUNTS ...................................................................... 9
        A. BACKGROUND TO THE CLASS PERIOD............................................................. 9
        B. THE JOINT VENTURE GENERAL MANAGER COMPENSATION PLAN ....... 11
        C. THE WRONGFUL ACTS ................................................................................14

VIII.   FACTS SPECIFIC TO COUNTS FOUR THROUGH SEVEN..................................... 15
        A. THE 2.0 CREDIT ...........................................................................................16

IX.     CLASS CLAIMS........................................................................................................17
        COUNT ONE .........................................................................................................17
        COUNT TWO.........................................................................................................18
        COUNT THREE ..................................................................................................... 21

X.      INDIVIDUAL CLAIMS ........................................................................................... 23
        COUNT FOUR ...................................................................................................... 23
        COUNT FIVE ........................................................................................................ 25

PRAYER FOR RELIEF..........................................................................................................27
DEMAND FOR JURY TRIAL ............................................................................................... 28

Plaintiffs Mark Boswell and David Lutton, individually and on behalf of all others similarly situated (the "Class"), bring this action against Defendants Panera Bread Company and Panera LLC (collectively, "Panera") to obtain damages and equitable relief arising from Panera's material misrepresentations and refusal to pay its employees in accordance with their contracts.

## I.  SUMMARY OF ACTION

1.  Panera owns and franchises bakery-cafes throughout the United States. The company employed Plaintiffs and the Class as Joint Venture General Managers ("JV GMs") to manage the daily operations of its company-owned cafes.

2.  The terms of the employment relationship between Panera and each JV GM were set forth in a standard five-year employment agreement and "Joint Venture General Manager Compensation Plan". Together, these unambiguous contracts comprised the "final, complete, and exclusive agreement between [the JV GM] and Panera with respect to any bonus, incentive plan, or other compensation."

3.  These contracts provided that the JV GM would receive a small annual salary for five years, and, at the end of the five-year term, a "one-time JV GM Buyout" payment. The amount of the Buyout was to be determined in accordance with specific provisions set forth in the Plan, which turned on the profitability of the JV GM's café. Pursuant to those provisions, the greater the difference between the aggregate profits attributed to a JV GM's café and the

1

applicable pre-determined "profit hurdle", the greater the Buyout amount.

4.     Neither the Plan nor the Agreement placed any limitation on the amount of the Buyout payment, or authorized Panera to reduce the amount of the Buyout payment below the amount required by the Plan. Indeed, the Plan forbade Panera from reducing the amount of any JV GM's Buyout payment without a written modification or waiver of the Buyout provisions of the Plan, signed by the JV GM.

5.     Panera did not obtain written modifications or waivers of the Plan's Buyout provisions signed by Plaintiffs or other members of the Class. Panera therefore had a contractual obligation to make Buyout payments to each Plaintiff and Class member in the full amount determined in accordance with the provisions of the Plan.

6.     Panera did not do this. Instead, beginning in 2011, Panera unilaterally imposed a "cap" on the Buyout payments it made to JV GMs. The purpose and effect of this action, instituted and approved by Panera's senior executives, was to reduce the amount of the Buyout payments it made to Plaintiffs and the Class below the amount required by the Plan.

7.     In so doing, Panera enriched itself by depriving these employees of compensation they had bargained for and earned.

8.     Panera is liable for its actions, which constitute material breaches of contract, conversion, and fraud.

## II.   JURISDICTION AND VENUE

9.      Plaintiffs, individually and on behalf of the proposed Class, bring this action to recover damages and obtain injunctive relief, costs of suit, and reasonable attorneys' fees arising from Panera's willful misrepresentations and refusal to perform its contractual obligations.

10.     The Court has personal jurisdiction over Panera because Panera maintains its principal place of business in Missouri. The Court also has personal jurisdiction pursuant to the Agreements at issue in this Complaint, which provide that "each party hereto agrees to submit to the exclusive personal jurisdiction and venue of the state and federal courts in the State of Missouri . . . for resolution of all disputes and causes of action arising out of this agreement."

11.     The Court has subject matter jurisdiction over this class action pursuant to 28 U.S.C. § 1332(d). Diversity of citizenship exists between the named Plaintiffs and the Defendants, and less than one-third of the members of the proposed Class are citizens of Missouri. Based upon the nature and extent of the business involved, Plaintiffs believe that there are at least one hundred Class members and that the amount in controversy exceeds $5 million, exclusive of interest and costs.

12.     The Court has subject matter jurisdiction over the named Plaintiffs' individual claims pursuant to 28 U.S.C. § 1332(a). Diversity of citizenship exists between each named Plaintiff and the Defendants, and the amount in controversy as to each named Plaintiff exceeds $75,000, exclusive of interest and costs.

3

13.     In addition, the Court has supplemental jurisdiction over the named Plaintiffs' individual claims pursuant to 28 U.S.C. § 1367(a) because they are so related to the class claims in this action that they form part of the same case or controversy.

14.     Venue is proper in this judicial district under 28 U.S.C. § 1391. Panera has its principal place of business in this district, routinely transacts business in this district, and a substantial part of the events that gave rise to this action occurred here.

## III.   INTRADISTRICT ASSIGNMENT

15.     Venue is proper in the St. Louis Division under Civil L.R. 3 - 2.07 because Panera has its principal place of business in St. Louis, routinely transacts business in St. Louis, and a substantial part of the events that gave rise to this action occurred in St. Louis.

## IV.   CHOICE OF LAW

16.     Missouri law applies to the claims of Plaintiffs and all Class members. Application of Missouri law is constitutional, and Missouri has strong interests in deterring unlawful business practices of resident corporations and compensating those harmed by activities occurring in and emanating from Missouri.

17.     The parties have agreed that Missouri law applies to the claims of Plaintiffs and all Class members. The Employment Agreements at issue in this Complaint provide that "the validity, interpretation, and performance of this

4

Agreement shall be governed by the laws of the State of Missouri without giving effect to the principles of comity or conflicts of laws thereof."

18. Plaintiffs' and Class members' relationship with Panera is centered in Missouri. Panera maintained (and continue to maintain) its principle place of business in St. Louis, and a substantial part of the events that gave rise to this action occurred in St. Louis.

19. For these reasons, among others, Missouri has significant contacts, and a significant aggregation of contacts, with all parties and the acts alleged herein. Missouri's substantial interests in this action far exceed those of any other state.

## V. PARTIES

### A. PLAINTIFFS

20. Plaintiff Mark Boswell is a resident of North Carolina. From approximately August 17, 2003 until July 1, 2014, Mr. Boswell was a resident of North Carolina and worked for Panera as a Joint Venture General Manager in Concord, North Carolina. Mr. Boswell was injured in his business or property by reason of Panera's wrongful acts alleged herein.

21. Plaintiff David Lutton is a resident of North Carolina. From approximately January 1, 2004 until July 15, 2014, Mr. Lutton was a resident of North Carolina and worked for Panera as a Joint Venture General Manager in Matthews, North Carolina. Mr. Lutton was injured in his business or property by reason of Panera's wrongful acts alleged herein.

**B.     DEFENDANTS**

22.     Defendant Panera Bread Company is a Delaware corporation registered to do business in Missouri. Its corporate headquarters are located at 3630 S. Geyer Road, Suite 100, St. Louis, Missouri 63127.

23.     Defendant Panera LLC is a Delaware limited liability company wholly owned by Panera Bread Company. Its principal place of business is also located at 3630 S. Geyer Road, Suite 100, St. Louis, Missouri 63127.

24.     Panera Bread Company and Panera LLC were the joint employers of Plaintiffs and the members of the proposed Class.

**VI.     CLASS ACTION ALLEGATIONS**

25.     Plaintiffs bring this action on behalf of themselves and all others similarly situated (the "Class") pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3). The Class is defined as follows:

> All natural persons who were employed as "Joint Venture General Managers" with Panera, or any affiliate or subsidiary of Panera, and who received a capped JV GM Buyout payment from Panera at any time during the period from January 1, 2011 through the date of trial (the "Class Period"). A "capped" Buyout payment is a Buyout payment made to an employee in an amount less than the total Buyout amount determined in accordance with the provisions of the employee's Joint Venture General Manager Compensation Plan.

26.     These persons constitute a class so numerous that joinder is

impracticable. Plaintiffs do not, as yet, know the exact size of the Class because such information is in the exclusive control of Panera. Based upon the nature and extent of the business involved, Plaintiffs believe that there are at least one hundred Class members, and that Class members are geographically dispersed throughout the United States. Joinder of all members of the Class, therefore, is not practicable.

27.     Joinder is also impracticable as Panera currently employs many members of the proposed class. These persons are unlikely to pursue individual claims against Panera for fear of losing their jobs.

28.     Because Panera acted uniformly in connection with all plaintiffs, this action presents questions of law and fact common to all members of the class, and which predominate over any questions affecting only individual members of the class.

29.     The questions of law or fact common to the Class include but are not limited to:

a.     whether the conduct of Panera constitutes a material breach of its contracts with Plaintiffs and the Class;

b.     whether Panera fraudulently induced Plaintiffs and the Class to accept employment with Panera;

c.     whether Panera fraudulently induced Plaintiffs and the Class to continue their employment with Panera;

d.     whether Panera's actions constitute conversion of personal property;

e. whether Plaintiffs and the Class suffered damages as a result of Panera's conduct;

f. the difference between the total compensation Plaintiffs and the Class received from Panera, and the total compensation Plaintiffs and the Class would have received in the absence of the wrongful and fraudulent acts alleged herein;

g. the type and measure of damages suffered by Plaintiffs and the Class.

30. These and other questions of law and fact are common to the Class, and predominate over any questions affecting only individual Class members.

31. The impacts of the offenses committed by Panera are common to all plaintiffs. Plaintiffs' claims are typical of the claims of the Class. Each named Plaintiff has a substantial financial interest in this action, and the interests of the named Plaintiffs are neither coincident with nor adverse to the class they represent. Therefore, these named Plaintiffs will adequately protect the interests of the class.

32. Plaintiffs have retained counsel competent in class action litigation to represent themselves and the Class.

33. Panera has acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

34. Panera utilizes standard compensation agreements and rigid

compensation practices that apply uniformly to all or nearly all Class members. Therefore, class-wide evidence is capable of showing that Panera's conduct violated its contractual obligations generally, and that this violation affected all or virtually all Class members.

35.     This class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy. Prosecution as a class action will eliminate the possibility of repetitive litigation. There will be no material difficulty in the management of this action as a class action. By contrast, prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Panera.

## VII.   FACTS COMMON TO ALL COUNTS

## A.   BACKGROUND TO THE CLASS PERIOD

36.     Panera is a restaurant chain that operates bakery-cafes throughout the country. Panera began as the Au Bon Pain Company, Inc. in Massachusetts in 1981 and expanded by purchasing the Saint Louis Bread Company in 1993. In 1998, the Company formally changed its name to The Panera Bread Company after selling the Au Bon Pain division.

37.     Between 2000 and 2005, Panera achieved rapid growth by continuously opening new company-owned and franchise-operated cafes in a ratio of 30/70, respectively, as set by the Company. As a result of this aggressive strategy, the total number of bakery-cafes more than quadrupled (from 183 stores

9

to 877 stores) from 2000 to 2005.

38. The arrangements between Panera and its franchisees, governed by Area Development Agreements ("ADA"), were designed to ensure this dramatic growth. Panera's ADAs required franchisees to open a pre-determined number of stores under threat of reacquisition – regardless of the economic environment or the success of existing stores in the area.

39. By the end of 2005, Panera's expansion strategy had caused it to become oversaturated in as many as 34 markets of the Nielson Top 50 markets. Increasingly, the Company suffered from cannibalization, resulting from too many stores opening in proximity to one another, which drove down average unit volume (i.e., weekly sales) and depleted margins.

40. Panera, however, continued to aggressively open new stores, as close as two miles to the franchisee stores, without regard for the resulting cannibalization. Panera's ADA's required franchisees to open a pre-determined number of stores each year, but as a result of cannibalization, franchisees had problems meeting requirements for not only the new store openings, but also sales targets at their existing stores.

41. Cannibalization hindered the ability of franchisees to open new stores. It became increasingly difficult for franchisees to meet Panera's store expansion goals, as existing franchisee operations yielded insufficient income to meet their own requirements, let alone to serve as start-up capital for new stores, the cost of which climbed from approximately $1.4 million in 2001 to $1.9 million

in 2008. The cannibalization was intensified for franchise-owned stores because of a 5% franchise fee on gross sales that all franchisees were contractually obligated to pay to Panera.

42.     Consequently, beginning in 2005, Panera experienced a dramatic reduction in the percentage of stores that were franchise owned, and a corresponding increase in its reliance on company-owned stores to drive growth. This change threatened to dramatically impact Panera's earnings. Indeed, Panera had a near 100% profit margin on franchisee stores, while company-owned stores generated profit margins of only 19%.

43.     Between 2005 and 2014, the percentage of company-owned stores to total stores increased from 30% to 49%, and the number of company-owned stores nearly tripled, from 311 stores to 867 stores.

## B.     THE JOINT VENTURE GENERAL MANAGER COMPENSATION PLAN

44.     During the Class Period, Panera employed Plaintiffs and the Class as Joint Venture General Managers ("JV GMs") to manage the daily operations of its company-owned cafes.

45.     Between 2005 and 2010, each Plaintiff and member of the Class entered into a written five-year "Employment and Confidentiality Agreement" and "Joint Venture General Manager Compensation Plan" with Panera. The Agreement and Plan were integrated, unambiguous contracts.

46.     The relevant terms of the individual Agreements and Plans signed by each Plaintiff and member of the Class were, in all material respects, identical

or substantially identical. Copies of the Agreements and Plans signed by the named Plaintiffs are attached hereto as Exhibits 1 and 2.

47.     Pursuant to these contracts, each Plaintiff and Class member agreed to be employed by Panera as the "Joint Venture General Manager" of a company-owned café, with managerial responsibility for all of the café's daily operations, and supervisory responsibility over all other employees at the café.

48.     Together, the Agreement and Plan comprised the "final, complete, and exclusive agreement between [the JV GM] and Panera with respect to any bonus, incentive plan, or other compensation."

49.     These contracts provided that the JV GM would receive a small annual salary for five years, and, at the end of the fifth year, a "one-time JV GM Buyout" payment.

50.     These contracts required that the amount of the Buyout payment was to be determined in accordance with specific provisions set forth in the Plan, which turned on the profitability of the JV GM's café. Pursuant to those provisions, the greater the difference between the aggregate profits attributed to a JV GM's café and the applicable pre-determined profit hurdle, the greater the Buyout amount.

51.     Neither the Plan nor the Agreement placed any limitation on the amount of the Buyout payment, or authorized Panera to reduce the amount of the Buyout payment below the full amount determined in accordance with the Plan.

52.     Indeed, the contracts forbade such behavior. In plain and

unambiguous terms, the Plan provided that "[n]o modification or waiver shall be valid unless in writing signed by the party against whom the same is sought to be enforced." The Plan thus barred Panera from reducing the amount of any JV GM's Buyout payment without a written modification or waiver of the Plan's Buyout provisions, signed by the JV GM.

53.     The Buyout provisions and "no modification" provisions were material terms of these contracts, because they governed the amount of compensation Plaintiffs and the Class were entitled to receive as employees of Panera.

54.     By entering into the Agreement and Plan with Plaintiffs and the Class, Panera represented to each Plaintiff and member of the Class that it would honor these contracts. Panera represented to Plaintiffs and the Class that it would pay them in accordance with the provisions of the Plan, and that it would not reduce their Buyout payments below what the Plan required without a written modification or waiver of the Plan, signed by the JV GM whose Buyout payment would be reduced by the modification or waiver.

55.     By not obtaining such written agreements from Plaintiffs and the Class, Panera continuously represented to Plaintiffs and the Class that it would make Buyout payments to them in accordance with the provisions of Plan.

56.     When Panera made these representations, it knew that they were false. In particular, when Panera represented to Plaintiffs and the Class that it would not reduce their Buyout payments without obtaining a signed modification

to the Plan, Panera knew this representation to be false.

57.     When Panera made these representations, it did so with the intention that Plaintiffs and the Class would rely upon them.

58.     When Plaintiffs and the Class agreed to manage Panera's cafes, and to continue their employment with Panera for five years, they relied on Panera's representations that it would honor their contracts. They relied on Panera's representations that it would pay them in accordance with the provisions of the Plan, that it would make Buyout payments to them in the amount required by the Plan. They relied on Panera's representations that it would not reduce their Buyout payments below what the Plan required without their signed consent to a written modification or waiver of the Plan. Plaintiffs and the Class continuously relied on these representations throughout their employment as JV GMs.

59.     The Buyout payments were wages earned by Plaintiffs and members of the Class and a material component of their compensation.

## C.     THE WRONGFUL ACTS

60.     During the Class Period, each Plaintiff and member of the Class was entitled to receive a Buyout payment pursuant to the Plan.

61.     Panera did not obtain written modifications or waivers of the Plan's Buyout provisions signed by Plaintiffs or other members of the Class. Panera thus had a contractual duty to make a Buyout payment to each Plaintiff and Class member in the full amount determined in accordance with the provisions of the Plan.

62.     Panera did not do this. Instead, beginning in 2011, Panera unilaterally imposed a "cap" on the Buyout payments it made to JV GMs. Panera's use of a cap reduced the amount of the Buyout payments it made to Plaintiffs and the Class below the amounts determined in accordance with the Plan.

63.     The purpose and effect of this practice, instituted and approved by Panera's executives, is that Panera willfully deprived Plaintiffs and the Class of wages they had bargained for and earned.

64.     Panera is liable for its actions, which constitute fraud in the inducement to enter into the Agreement and Plan, conversion, and material breaches of contract.

## VIII.  FACTS SPECIFIC TO COUNTS FOUR AND FIVE

65.     Pursuant to the Plan, the Buyout amount is a function of the difference between the total profits attributed to a JV GM's store and the applicable pre-determined "profit hurdle" for that store. Thus, the suppression of total profits attributed to a store will result in a suppression of the Buyout payment to that store's JV GM.

66.     While most of the factors affecting a store's profits, such as quality control and customer service, are within the control of the JV GM's independent judgment and decision-making, sometimes Panera makes decisions that serve its own interests, but predictably decrease a store's profits, which the JV GM cannot control.

## A.   THE 2.0 CREDIT

67.    In 2013, Panera selected stores in the Charlotte, North Carolina area, including Plaintiffs' stores, to implement "Panera 2.0" — a new "operating system" that entailed substantial increases in a store's operating costs.

68.    Because increased costs at a JV GM's store decrease that store's profits, and thus, the amount of the JV GM's Buyout payment, the impact of Panera 2.0 on their store profits was a critical concern for Plaintiffs in deciding whether to implement Panera 2.0 in their stores, and in deciding whether to continue their employment with Panera.

69.    To induce Plaintiffs to implement Panera 2.0 and continue their employment, despite the negative impact on their stores' profits, Panera promised Plaintiffs and other Charlotte area JV GMs a profit "credit" to offset the increased operating costs attributable to Panera 2.0.

70.    When Plaintiffs agreed to implement Panera 2.0 in their stores, and continue his employment, despite the negative impact on their store profits, Plaintiffs relied on the representations of Panera that it would provide a profit credit to offset the increased operating costs attributable to Panera 2.0.

71.    Although Panera intended Mr. Boswell and Mr. Lutton to rely on its representations, Panera had no intention of providing the credit. When Panera calculated Plaintiffs' Buyout payments in March 2014, Panera did not credit their respective profits to offset the increased operating costs of Panera 2.0. Because the omission of this credit suppressed the total profits attributable to Plaintiffs' cafes,

16

the amounts of Mr. Boswell's and Mr. Lutton's respective (uncapped) Buyout

payments were suppressed.

72.    As a direct and proximate result of Panera's misrepresentations,

Plaintiffs Boswell and Lutton suffered irreparable injury and monetary damages.

## IX.   CLASS CLAIMS

### COUNT ONE

### BREACH OF CONTRACT

73.    Plaintiffs re-allege and incorporate herein by reference each and

every paragraph and allegation above as though fully set forth herein.

74.    Each Plaintiff and member of the Class had a valid and enforceable

contract with Panera through the Agreement and Plan described above.

75.    Pursuant to the Plan, each Plaintiff and member of the Class had a

contractual right to receive a Buyout payment from Panera in the amount

determined in accordance with the specific provisions set forth in the Plan.

76.    Pursuant to the Plan, Panera had a contractual duty to make a

Buyout payment to each Plaintiff and member of the Class in the amount

determined in accordance with the specific provisions set forth in the Plan.

77.    The Buyout payments were wages earned by Plaintiffs and the Class

and a material component of their compensation.

78.    Panera materially breached its contracts with Plaintiffs and the Class

by unilaterally reducing the amounts of the Buyout payments to Plaintiffs and the

Class below the amounts determined in accordance with the Plan.

79.     As a direct and proximate result of Panera's conduct in violation of these contracts, Plaintiffs and the Class suffered monetary damages.

80.     Accordingly, Plaintiffs and the Class pray for judgment in their favor and against Panera:

A.     Declaring that Panera materially breached its contracts with Plaintiffs and the Class;

B.      Awarding Plaintiffs and the Class damages in an amount to be proven at trial; and

C.     Awarding Plaintiffs and the Class prejudgment interest, plus costs of suit and reasonable attorney fees.

## COUNT TWO

## FRAUD

81.     Plaintiff re-alleges and incorporates herein by reference each and every paragraph and allegation above as though fully set forth herein.

82.     By entering into the Agreement and Plan with Plaintiffs and the Class, Panera represented to each Plaintiff and member of the Class that it would honor the plain terms of these contracts. Panera represented to Plaintiffs and the Class that it would pay them in accordance with the provisions of the Plan, including the Buyout provisions, and that it would not reduce their compensation below what the Plan required without a written modification or waiver of the Plan, signed by the JV GM whose compensation would be reduced by the modification

or waiver.

83.     By not obtaining such written agreements from Plaintiffs and the
Class, Panera continuously represented that it would compensate them in
accordance with the provisions of Plan.

84.     Panera's representations described above were material, because
the Plan governed the compensation that Plaintiffs and Class members were
entitled to receive as employees of Panera.

85.     Panera's representations were false. Panera did not pay Plaintiffs
and Class the Buyout payments as required by the Plan. Instead, and without
obtaining written modifications signed by Plaintiffs and the Class, Panera reduced
the amounts of the Buyout payments to Plaintiffs and the Class below the amounts
required by the Plan.

86.     When Panera made these representations, it knew that they were
false. In particular, when Panera represented to Plaintiffs and Class that it would
not reduce their compensation without obtaining a signed modification to the
Plan, Panera knew this representation to be false.

87.     When Panera made these representations, it did so with the
intention that Plaintiffs and the Class would rely upon them.

88.     When Plaintiffs and the Class agreed to accept employment with
Panera, they relied on Panera's representations that it would pay them in
accordance with the provisions of the Plan, and that it would not reduce their
compensation below what the Plan required without obtaining a signed

19

modification to the Plan.

89.     When Plaintiffs and the Class agreed to continue their employment with Panera, they relied on Panera's representations that it would pay them in accordance with the provisions of the Plan, and that it would not reduce their compensation below what the Plan required without obtaining a signed modification to the Plan.

90.     As employees of Panera, Plaintiffs and the Class had a right to rely on Panera's representations.

91.     Plaintiffs and the Class did not know, and could not have known, that Panera's representations were false.

92.     As a direct and proximate result of their reliance on Panera's material misrepresentations, Plaintiffs and the Class suffered irreparable injury and monetary damages.

93.     Panera's actions described herein were willful, malicious, and without legal justification.

94.     Accordingly, Plaintiffs and the Class pray for judgment in their favor and against Panera:

A.      Declaring that Panera's actions constitute fraud;

B.      Declaring that Panera's actions were willful, malicious, and without legal justification;

C.      Awarding Plaintiffs and the Class compensatory damages in an amount to be proven at trial;

D.      Awarding Plaintiffs and the Class prejudgment interest, plus costs of suit and reasonable attorney fees;

E.      Awarding punitive damages against Panera in an amount sufficient to deter similar conduct by Panera and others in the future; and

F.      Permanently enjoining Panera from ever again engaging in similar conduct against its employees in the future.

### COUNT THREE

### CONVERSION

95.     Plaintiffs re-allege and incorporate herein by reference each and every paragraph and allegation above as though fully set forth herein.

96.     Each Plaintiff and member of the Class was entitled to receive a Buyout payment in the full amount determined in accordance with the Plan.

97.     Each Plaintiff and member of the Class was entitled to own and possess a Buyout payment in the full amount determined in accordance with the Plan.

98.     Each Plaintiff and member of the Class has the right to immediate possession of a Buyout payment in the full amount required by the Plan.

99.     When Panera refused to make Buyout payments to Plaintiffs and the Class in the full amounts required by the Plan, Panera intentionally took from each Plaintiff and member of the Class tangible, identifiable funds that rightfully belonged to Plaintiffs and the Class. These tangible, identifiable funds are the personal property of Plaintiffs and the Class.

100. When Panera refused to make Buyout payments to Plaintiffs and the Class in the full amounts required by the Plan, Panera intentionally deprived each Plaintiff and member of the Class of the possession of their personal property.

101. Panera had no authority or lawful justification to take the personal property of Plaintiffs and the Class. Panera had no authority or lawful justification to deprive Plaintiffs and the Class of the possession of their personal property.

102. Panera's actions described herein were willful, malicious, and without legal justification.

103. As a direct and proximate result of Panera's conversion of their personal property, Plaintiffs and the Class suffered irreparable injury and monetary damages.

104. Accordingly, Plaintiffs and the Class pray for judgment in their favor and against Panera:

    A. Declaring that Panera's actions constitute conversion of the personal property of Plaintiffs and the Class;

    B. Declaring that Panera's actions were willful, malicious, and without legal justification;

    C. Awarding Plaintiffs and the Class compensatory damages in an amount to be proven at trial;

    D. Awarding Plaintiffs and the Class prejudgment interest, plus costs of suit and reasonable attorney fees;

    E. Awarding punitive damages against Panera in an amount sufficient

to deter similar conduct by Panera and others in the future; and

F.      Permanently enjoining Panera from ever again engaging in similar

conduct against its employees in the future.

## X.      INDIVIDUAL CLAIMS

### COUNT FOUR

### FRAUD

105.    Plaintiffs re-allege and incorporate herein by reference each and

every paragraph and allegation above as though fully set forth herein.

106.    To induce Plaintiff Boswell and Plaintiff Lutton to implement Panera

2.0 in the stores and continue their employment, despite the negative impact of

Panera 2.0 on their stores' profits, Panera promised Plaintiffs and other Charlotte

area JV GMs a profit credit to offset the increased operating costs attributable to

Panera 2.0.

107.    When Plaintiffs agreed to implement Panera 2.0 in their stores, and

continue their employment, Plaintiffs relied on the representations of Panera that

it would provide a profit credit to offset the increased operating costs attributable

to Panera 2.0. Panera's representations were therefore material to each Plaintiff's

decision to continue his employment with Panera.

108.    As employees of Panera, Plaintiff's had a right to rely on Panera's

representations.

109.    Although Panera intended Plaintiffs to rely on its representations,

Panera had no intention of providing the credit. It made these representations

23

knowing that they were false. When Panera calculated Plaintiffs' Buyout payments in March 2014, Panera did not credit their respective profits to offset the increased operating costs of Panera 2.0.

110. Because the omission of this credit suppressed the total profits attributable to Plaintiffs' cafes, the amounts of Mr. Boswell's and Mr. Lutton's respective (uncapped) Buyout payments were suppressed.

111. Plaintiffs did not know, and could not have known, that Panera's representations were false.

112. As a direct and proximate result of their reliance on Panera's material misrepresentations, Plaintiffs suffered irreparable injury and monetary damages.

113. Panera's actions described herein were willful, malicious, and without legal justification.

114. Accordingly, Plaintiffs Mark Boswell and David Lutton prays for judgment in their favor and against Panera:

    A. Declaring that Panera's actions constitute fraud;

    B. Declaring that Panera's actions were willful, malicious, and without legal justification;

    C. Awarding Plaintiffs compensatory damages in an amount to be proven at trial;

    D. Awarding Plaintiffs prejudgment interest, plus costs of suit and reasonable attorney fees;

E.     Awarding punitive damages against Panera in an amount sufficient to deter similar conduct by Panera and others in the future; and

F.     Permanently enjoining Panera from ever again engaging in similar conduct against its employees in the future.

## COUNT FIVE

### UNJUST ENRICHMENT

115.   Plaintiffs re-allege and incorporate herein by reference each and every paragraph and allegation above as though fully set forth herein.

116.   When Plaintiff Boswell and Plaintiff Lutton implemented Panera 2.0 in the stores and continued their employment with Panera, despite the negative impact of Panera 2.0 on their stores' profits, Plaintiffs conferred a benefit on Panera.

117.   Panera acknowledged or recognized that Plaintiffs conferred a benefit on Panera by implementing Panera 2.0 in their stores and continuing their employment with Panera.

118.   Panera accepted and retained that benefit under circumstances in which retention without payment would be unjust. Panera induced Plaintiffs to implement Panera 2.0 in the stores and continue their employment with Panera by promising them a profit credit offset the increased operating costs of Panera 2.0. then failed to provide that credit.

119.   As a direct and proximate result of Panera's actions, Plaintiffs suffered irreparable injury and monetary damages, while Panera benefitted from

their continued employment and implementation of Panera 2.0 in their stores.

120.    As a direct and proximate result of Panera's actions, Panera enriched itself at the expense of Plaintiff Boswell and Plaintiff Lutton. Allowing Panera to retain that benefit without payment to Mr. Boswell and Mr. Lutton would be unjust.

121.    Panera's actions described herein were willful, malicious, and without legal justification.

122.    Accordingly, Plaintiffs Mark Boswell and David Lutton pray for judgment in their favor and against Panera:

A.    Declaring that Plaintiffs conferred a benefit on Panera, and that. Panera accepted and retained that benefit under circumstances in which retention without payment to Plaintiffs would be unjust;

B.    Declaring that Panera's actions were willful, malicious, and without legal justification;

C.    Awarding Plaintiffs restitution in an amount to be proven at trial;

D.    Awarding Plaintiffs prejudgment interest, plus costs of suit and reasonable attorney fees;

E.    Awarding punitive damages against Panera in an amount sufficient to deter similar conduct by Panera and others in the future; and

F.    Permanently enjoining Panera from ever again engaging in similar conduct against its employees in the future.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court enter judgment on their behalf and that of the Class:

A.     Ordering that this action may be maintained as a class action, with Plaintiffs as the designated Class representatives and their counsel as Class counsel;

B.     Declaring that Defendants' actions constitute a material breach of their contractual duties to Plaintiffs and the Class, conversion of the personal property of Plaintiffs and the Class, and fraud against Plaintiffs and the Class;

C.     Declaring that Defendants' actions against Plaintiffs and the Class were willful, malicious, and without legal justification;

D.     Awarding Plaintiffs and the Class compensatory damages against the Defendant for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

E.     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

F.     Declaring that Defendants' actions against Plaintiff Boswell and Plaintiff Lutton constitute fraud and unjust enrichment;

G.     Declaring that Panera's actions against Plaintiff Boswell and Plaintiff Lutton were willful, malicious, and without legal justification;

H.     Awarding Plaintiffs Boswell and Lutton compensatory damages and

restitution in an amount to be proven at trial, including interest thereon;

I.     Awarding Plaintiffs their reasonable costs and expenses incurred in

this action, including counsel fees and expert fees;

J.     Permanently enjoining Defendants from ever again engaging in

similar conduct against its employees in the future; together with

K.     such other and further relief as the Court may deem just.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a jury

trial for all claims and issues so triable.

Respectfully submitted,

MARK BOSWELL and DAVID LUTTON,
individually and on behalf of all those
similarly situated,
By Counsel

Dated:        October 28, 2014

/s/Timothy Coffield
Timothy Coffield (VA State Bar No. 83430)
5374 Gordonsville Road
Keswick, VA 22947
434 218 3133 | tc@coffieldlaw.com

Counsel for Plaintiffs and the Proposed Class

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 28, 2014, a true and correct copy of the foregoing Complaint was delivered to a qualified process server with instructions to serve the same upon the Defendants or their registered agents at the following address:

> PANERA BREAD COMPANY
> c/o CSC-Lawyers Incorporating Service Company
> Registered Agent
> 221 Bolivar Street
> Jefferson City, MO 65101
>
> PANERA LLC
> c/o CSC-Lawyers Incorporating Service Company
> Registered Agent
> 221 Bolivar Street
> Jefferson City, MO 65101

/s/Timothy Coffield
Timothy Coffield
Counsel

50084.1

29

CLASS ACTION COMPLAINT
CASE NO. _____