# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| MARK BOSWELL, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 4:14-CV-01833-AGF |
| | ) | |
| PANERA BREAD COMPANY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

This class action is before the Court on the motion (Doc. No. 133) for summary

judgment filed by Defendants Panera Bread Company and Panera, LLC seeking summary

judgment on all counts of Plaintiffs' amended complaint: a classwide breach of contract

claim (Count I); a classwide fraud claim (Count II); and individual claims by named

Plaintiffs Mark Boswell and David Lutton for fraud (Count III) and unjust enrichment

(Count IV). Also before the Court are Plaintiffs' second amended motion[1] (Doc. No.

205) for summary judgment on their classwide breach of contract claim (Count I), and

Plaintiffs' motion (Doc. No. 110) for summary judgment on Defendants' affirmative

defenses. The Court heard oral argument on these motions on February 23, 2016.

At oral argument, the Court raised the question of whether *Cook v. Coldwell*

---

[1] Plaintiffs' original motion for summary judgment on their breach of contract claim requested damages on behalf of the 67 class members identified at the time the motion was filed. Plaintiffs' first amended motion requested damages on behalf of those 67 class members and a newly identified additional class member. However, after filing the amended motion, one class member opted out of this Federal Rule of Civil Procedure 23(b)(3) class action. Therefore, in their second amended motion, Plaintiffs request contract damages on behalf of 67 class members, in the amount of $3,841,777.

*Banker*, 967 S.W.2d 654 (Mo. Ct. App. 1998), applied to Plaintiffs' breach of contract claim, involving what is essentially Defendants' promise to pay a bonus. Although neither side cited *Cook*, either in their summary judgment briefing or at the earlier class certification stage, *Cook* appeared to be directly relevant to Plaintiffs' contract claim, in that it held that "[a] promise to pay a bonus in return for an at-will employee's continued employment is an offer for a unilateral contract which becomes enforceable when accepted by the employee's performance" and which cannot be revoked once the offeree has made substantial performance. *Cook*, 967 S.W.2d at 657. Following oral argument, the parties submitted, at the Court's request, simultaneous supplemental briefs as to (1) whether *Cook* applied to Plaintiffs' contract claim, and (2) if so, whether and how that finding impacts the class action.

Upon review of the supplemental briefs and the rest of the record in this case, and for the reasons set forth below, the Court will grant Defendants' motion for summary judgment as to Plaintiffs' classwide breach of contract claim against Panera Bread Company only, and as to Plaintiffs' classwide and individual fraud claims; deny Defendants' motion as to Boswell and Lutton's individual unjust enrichment claims; grant Plaintiffs' motion for summary judgment on their classwide breach of contract claim against Panera, LLC only; and grant Plaintiffs' motion for summary judgment on Defendants' affirmative defenses.

## BACKGROUND

For purposes of the motions before the Court, the record establishes the following. Named Plaintiffs Boswell, Lutton, and Vickie Snyder represent a class of 67 individuals

employed as Joint Venture General Managers ("JV GMs") by Defendants Panera, LLC, and Panera Bread Company (collectively, "Panera"), who signed a JV GM Compensation Plan ("Compensation Plan") and who received a capped buyout payment from Panera during the relevant time period.  A "capped" buyout payment is a buyout payment made to an employee in an amount less than the total buyout amount determined in accordance with the formula set forth in Section 3(b) of the Compensation Plan.

In 2002, to recruit and retain cafe general managers, Panera created the JV GM program.  JV GMs were at-will employees responsible for managing all aspects of their respective cafes and were ultimately accountable for the profit, sales, and costs in their cafes.  The JV GM program was initially overseen by Panera's JV Board, comprised of several Panera executives.

Named Plaintiffs Boswell and Lutton began their employment with Panera as JV GMs in 2004.  Named Plaintiff Snyder began her employment with Panera as a JV GM in 2007.  All were employed at will.

The JV GM program included three compensation components:  a base salary, monthly bonuses, and a long-term incentive bonus, known as a "buyout payment."  In 2007, Panera determined that the JV GM program was not sufficiently compensating JV GMs, and Panera believed that changes to the buyout payment calculation were necessary to recruit and retain top talent.

Thus, in 2007, Panera began offering a standard JV GM Employment Agreement ("Agreement"), which expressly referenced the Compensation Plan and which provided that the Compensation Plan shall be executed "concurrently" with the Agreement.  The

parties agree that the Agreement and Compensation Plan should be considered together, as a single agreement. The Agreement and Compensation Plan were drafted by Panera, and both contain a Missouri choice-of-law provision.

Between 2007 and early 2010, each class member entered into identical Agreements and Compensation Plans with Panera, LLC.[2] Nine of the class members executed their Agreements and Compensation Plans in 2007; 37 did so in 2008; 20 did so in 2009; and the last one did so in March 2010. The three named Plaintiffs were among the group of class members who entered into their Agreements and Compensation Plans in 2009.[3]

Each Agreement and Compensation Plan provided that the JV GM's employment by Panera was at-will, and that either the JV GM or Panera could terminate the Agreement at any time, with or without cause. Each Agreement and Compensation Plan also included several terms and conditions of employment. For example, the Compensation Plan included a waiver of the right to a jury trial for legal actions arising out of the Agreement and Compensation Plan, an agreement by the JV GMs not to disclose Panera's confidential information, an agreement by Panera to pay the JV GMs a base salary, and an agreement by Panera to pay the JV GMs, at the end of five years, a one-time buyout payment.

---

[2]     Panera Bread Company was not a party to the Agreements and Compensation Plans.

[3]     Boswell and Lutton also entered into a previous agreement with Panera, in 2004, that provided for a separate buyout payment at the end of five years. Boswell and Lutton's 2004 agreements are not at issue in this case.

Section 3(a) of the Compensation Plan provided:

> Panera shall, if it is required to do so pursuant to this Section 3, make a one-time JV GM Buyout for the Bakery-Cafe on the terms and conditions set forth herein and upon execution and delivery of such agreements as are reasonably requested by Panera.[4] In order to receive the JV GM Buyout payment for the Bakery-Cafe, you must, as of the date on which the payment is made in accordance with this Section 3, (i) be an employee of Panera as of the date on which payment of the JV GM Buyout is made, (ii) be performing the duties of the position currently entitled JV GM as of this date, and (iii) not be in breach of any provision of your Employment Agreement or any other obligation owed to Panera or its affiliates.

(Doc. No. 167 at 4.)

The amount of the buyout payment was to be determined in accordance with a formula set forth in Section 3(b) of the Compensation Plan. The formula turned on the profitability of the JV GM's cafe during the last two years of a five-year period. One of the components of the buyout formula was a store profit hurdle, which was explicitly set forth in the Compensation Plan but for which Panera retained the sole discretion to change.

The "Buyout Date" was defined in each Compensation Plan as a date five years from when the Plan was executed. Section 3(c) of the Compensation Plan stated that "Panera shall make any JV GM Buyout payment that is due and payable . . . no later than the fifth fourteen day payroll after the fiscal period during which the Buyout Date occurs" and that "in no event will payment occur after March 15th of the calendar year following the calendar year in which the Buyout Date occurs." (Doc. No. 167 at 5.)

Section 5(d) of the Compensation Plan also included the following clause with

---

[4]    It is undisputed that all class members executed and delivered any agreements required for the buyout payment.

respect to modifications and waivers:

> This Plan is the final, complete and exclusive agreement between [the JV GM] and Panera with respect to any bonus, incentive plan or other compensation, except as specifically set forth in [the JV GM's] Employment Agreement with Panera, and supersedes and merges all prior discussions and other agreements between us. No modification or waiver shall be valid unless in writing signed by the party against whom the same is sought to be enforced.

*Id.* at 5-6.

The Agreement, executed by the class members at the same time as the Compensation Plan, also included the following "waiver" provision in Section 15:

> The failure of a party to enforce any term, provision, or condition of this Agreement at any time or times shall not be deemed a waiver of that term, provision, or condition for the future, nor shall any specific waiver of a term, provision, or condition at one time be deemed a waiver of such term, provision, or condition for any future time or times.

(Doc. No. 166 at 4.)

Panera considered the provisions of Section 3(a) of the Compensation Plan in determining whether to make buyout payments to the class members, and Panera ultimately made a buyout payment to every member of the class, but, as discussed below, in an amount that did not adhere to the written terms of Section 3(b) of the Compensation Plan.

**Capped Buyout Payments**

In 2010, Panera decided to impose a $100,000 cap on all JV GM buyout payments. At oral argument, Panera stated that this cap was not due to a change in the store profit hurdle, the component of Section 3(b)'s buyout formula which Panera retained the discretion to alter, but was instead imposed uniformly across the board,

regardless of Section 3(b)'s buyout formula.

Plaintiff did not communicate this change in the buyout program to the JV GMs until the first quarter of 2011, when Panera gave presentations to JV GMs in various markets about the cap. The presentations noted that, starting in January 2012, JV GM buyouts would be capped at $100,000. The presentation materials indicated that the change was the result of JV GMs making "in excess of what the program intended." (Doc. No. 169 at 5.) The presentations were not given in the Charlotte, North Carolina market where named Plaintiffs Boswell, Lutton, and Snyder worked, but these Plaintiffs were informed of the buyout cap around the same time by other methods. Specifically, documentation regarding the changes to the buyout program was made available to all JV GMs on Panera's intranet site, and all JV GMs received monthly reports showing how close they were to the buyout cap.

Beginning in 2012, each class member received a capped buyout payment. At oral argument, Plaintiffs confirmed that all of these capped buyout payments were made within the time prescribed in Section 3(c) of the Compensation Plan. Panera prepared a buyout report spreadsheet for every class member, which contained fields titled "total buyout before cap," reflecting the buyout calculated using the formula in Section 3(b) of the Compensation Plan, and "total buyout with cap," reflecting the capped buyout.[5]

Panera did not receive any complaints or objections regarding the buyout caps until Boswell raised a concern in 2014, shortly before receiving his capped buyout

---

[5] The difference between the uncapped and capped buyout payments for each class member ranged from hundreds of dollars to, in one case, a little more than $200,000. (Doc. No. 112.)

payment. Every class member accepted his or her capped buyout payment, including Boswell, and no class member resigned as a result of the changes to the buyout program. Panera has also produced declarations from two class members, both currently employed by Panera, who state that they were made aware of the buyout cap, they did not disagree with or object to the cap, and they believe they have now been paid everything owed by Panera.

Every class member but one (JV GM 42) was an employee of Panera as of the date that he or she received a capped buyout payment. Panera paid JV GM 42 a capped buyout payment one week after the employee left Panera. Likewise, Panera's records show that all class members except two (JV GM 42 and Boswell) were performing the role of JV GMs as of the date they received a capped buyout payment. Panera paid Boswell a capped buyout payment on May 27, 2014. Panera's records show that, on that date, Boswell was in the position of market training manager—a position with different duties than that of JV GM—though the parties dispute whether he began working in this position on May 27 or two days later, on May 29, 2014. As to the requirement that JV GMs not be in breach of their Agreements or of any other obligation owed to Panera, Panera has only identified one class member who violated an employment policy, named Plaintiff Snyder. Panera asserts that Snyder violated an employment policy by employing a relative—her son—from May 24 until August 26, 2014. Panera nevertheless paid Snyder a capped buyout payment on September 2, 2014.

Panera's corporate representative testified by deposition that one of the reasons Panera decided to impose the buyout cap was that it determined that the buyout payments

were exceeding Panera's "target compensation ranges" and were exceeding Panera's "original intention." (Doc. No. 163-17 at 29.) However, another representative indicated in his deposition that, at the time of entering the Compensation Plans in 2007, there was no particular size of a buyout that Panera would have refused to pay and that, for example, Panera would have paid even a $500,000 buyout.

In their amended complaint, Plaintiffs allege that Panera's imposition of a cap constituted a breach of contract. Plaintiffs also allege that Panera never intended to comply with its promise to make buyout payments in the amount set forth in the written Compensation Plans and that, therefore, Panera fraudulently induced the class members to enter the Compensation Plans.

## Panera 2.0 Operating System

In 2013, Panera selected named Plaintiffs Boswell and Lutton's cafes, as well as other cafes in the Charlotte, North Carolina market, as locations to test a new operating system known as the "Panera 2.0" system. Plaintiffs Boswell and Lutton were asked to implement Panera 2.0 in their respective cafes, which entailed substantial increases in their cafes' operating costs and could, therefore, impact their profits and buyout payments.

Boswell and Lutton have submitted declarations stating that, after expressing concern to Panera CEO Ron Shaich, Shaich told Boswell, Lutton, and the other Charlotte-area JV GMs that he was giving them his "personal guaranty" that they "would be made whole" for the increased costs associated with implementing Panera 2.0 through a "profit credit" sufficient to offset these costs. Boswell and Lutton state in their

declarations that "Mr. Shaich indicated that the credit would be applied to the financial statements (Buyout reports) used to calculate the Buyout payments of JV GMs who implemented Panera 2.0 during the two-year period in which store profits counted toward their Buyout payments," and that they relied on such representations in agreeing to implement Panera 2.0 in their stores. (Doc. Nos. 164-21 at 3 & 164-23 at 4.)

The parties agree that at the time of Shaich's alleged oral comments, Panera had not yet determined what amount of profit credits might be provided, there was no plan in place regarding the impact of Panera 2.0 on the JV GM buyouts, and Panera did not know how the implementation of Panera 2.0 would impact the cafes' profitability. Panera's corporate representative testified that the Panera 2.0 profit credits were originally intended to protect monthly bonus rates and that protection of buyout amounts "was not part of the original discussions" for the profit credits. (Doc. No. 164-12 at 109.)

Panera did not apply profit credits when calculating Boswell and Lutton's buyout payments. Panera did provide Boswell and Lutton with Panera 2.0 profit credits in their monthly bonuses, but these monthly bonus credits did not affect the calculation of their buyout payments. In their declarations, Boswell and Lutton state that implementing Panera 2.0 in their cafes increased each of their operating costs by more than $100,000 for the year 2013. Both Plaintiffs assert that these increased costs brought down their cafe profits in 2013, notwithstanding that their net sales had remained steady or increased in 2013 as compared to the prior year. Boswell declares that the decrease in his cafe's profits due to the costs of implementing Panera 2.0 caused his buyout payment to decrease by $33,015. Likewise, Lutton declares that the decrease in his cafe's profits due

to the Panera 2.0 costs caused his buyout payment to decrease by $42,455.

After Boswell and Lutton resigned their employment, Panera began applying profit credits to the buyout payments of the other JV GMs who had implemented Panera 2.0 in their cafes. In their individual claims, sounding in fraud and unjust enrichment, Boswell and Lutton seek to have profit credits applied to their buyout payments, to offset the costs of implementing Panera 2.0.

## ARGUMENTS OF THE PARTIES

Panera seeks summary judgment on all counts of Plaintiffs' amended complaint. As to Plaintiffs' breach of contract claim (Count I), Panera first argues that this claim fails as to Panera Bread Company due to lack of privity. At oral argument, Plaintiffs conceded that Panera Bread Company is entitled to summary judgment on Count I. As such, the Court will grant this part of Panera's motion.

As to Plaintiffs' breach of contract claim against Panera, LLC, which was a party to the Compensation Plan, Panera argues that the claim fails as a matter of law because the Compensation Plan was properly novated. In its initial briefs, Panera argued that if the Compensation Plan was a valid, bilateral contract, then that contract was novated by the class members' implied assent. Under this theory, Panera argued that, by continuing to work for (and be paid by) Panera without objection after learning about the buyout cap and by ultimately accepting the capped buyout payments, the class members assented to and provided consideration for a novated contract.

Alternatively, in its supplemental brief submitted after oral argument, Panera argues that the Compensation Plan was merely an offer for a unilateral contract, which

was properly modified by Panera's announcement of the buyout cap. Under this theory, Panera argues that most, if not all, of the class members had not substantially performed under their Compensation Plans by the time the buyout cap was announced and that Panera was therefore free to revoke the Compensation Plan in favor of a new offer for a capped buyout payment. Specifically, Panera argues that "performance" under the Compensation Plan could not have begun until the last two years of the five-year period covered by the Plan because the buyout payment was calculated based solely on each cafe's profitability in those last two years. Panera asserts that because the vast majority of the class members had not reached those last two years before the buyout cap was announced, the Compensation Plan was properly revoked and modified as to most or all class members. Panera also argues that the class should be decertified because the issue of substantial performance is an inherently individualized inquiry.

Plaintiffs oppose Panera's motion and have filed a cross motion for summary judgment on their contract claim. In their initial briefs, Plaintiffs argued that the Compensation Plan was a valid contract and that Panera's novation defense failed as a matter of law for four reasons. First, Plaintiffs argued that Section 5(d) of the Compensation Plan precluded modification or novation in the absence of a signed writing. Second, Plaintiffs argued that novation of the Compensation Plan by oral agreement was also precluded under the statute of frauds because the contract could not be performed within one year. Third, Plaintiffs argued that the purportedly novated agreements failed for lack of consideration because continued at-will employment does not constitute valid consideration under Missouri law. Finally, Plaintiffs argued that the

novated agreements were not valid contracts because, as shown by the "JV GM Program Overview" sheet documenting the terms of the buyout cap, Panera retained the unilateral ability to "modify, amend, or discontinue the JV GM program at any time without notice," which Plaintiffs argued made the agreements illusory and unenforceable. In the absence of any novated agreements, Plaintiffs argued that the written terms of the Compensation plan must control, and that Panera undisputedly breached those terms by capping the buyout payments.

In their supplemental brief submitted after oral argument, Plaintiffs continue to contend that the Compensation Plan was a valid bilateral contract, containing a host of binding mutual promises, and that as such, the Compensation Plan could not be modified or novated without new consideration, which was lacking. Alternatively, Plaintiffs argue that even if the Compensation Plan was an offer for a unilateral contract, the offer could not have been revoked or modified by Panera's announcement of a buyout cap because, by that time, all class members had substantially performed by working as JV GMs under the terms of the Compensation Plan for at least one year (and most for more than one year). Plaintiffs argue that this finding would not require decertification of the class action because the question of what constitutes substantial performance would be common to the class and could be applied to all class members in uniform fashion. Plaintiffs also argue that Panera waived any revocation defense by failing to plead it.

As damages, Plaintiffs seek the difference between the total buyout payments according to the terms of Section 3(b) of the Compensation Plan and the capped buyout payments the class members actually received, as documented in Panera's buyout reports.

Plaintiffs assert that this amounts to $3,841,777 in damages on behalf of the class, plus damages incurred by any additional class members identified before the date final judgment is entered.[6]

Panera responds that if the Compensation Plan was not novated or modified, then factual issues remain regarding whether certain class members fulfilled the Compensation Plan's conditions precedent to receiving a buyout payment. Panera identifies three class members who arguably failed to satisfy a such a condition precedent. First, Panera argues that Snyder failed to satisfy the condition that she not be in breach of any obligation owed to Panera because she employed her son in her cafe, in violation of one of Panera's employment policies. Second, Panera argues that Boswell failed to satisfy the condition that he be performing the duties of a JV GM on the date of his buyout payment because he may have transferred positions before that date. Third, Panera argues that JV GM 42 failed to satisfy the conditions that he or she be employed by Panera and performing the duties of a JV GM on the date of his or her buyout payment because the employee had left Panera's employment by that date. Panera argues that, although it made capped buyout payments to each of these class members, the no-waiver clause in Section 15 of the Agreement precludes a finding that Panera waived its ability to enforce the Compensation Plan's conditions in this litigation. Panera has neither identified nor provided evidence regarding any other class member who allegedly failed

---

[6]     At oral argument, the parties asserted that, if the Court granted Plaintiffs' motion for summary judgment on the contract claim, the parties were essentially in agreement as to the damages amount and could submit supplemental briefs regarding the amount of damages.

to satisfy a condition precedent to receiving a buyout payment.

Panera also seeks summary judgment on Plaintiffs' classwide fraud claim (Count II). Panera argues that, under Missouri law, Plaintiffs cannot base a fraud claim solely on Panera's alleged failure to fulfill contractual promises. To the extent that Plaintiffs attempt to state a claim for fraud in the inducement, Panera argues that Plaintiffs have not offered any evidence to support their allegation that Panera did not intend to fulfill its promise to pay the buyouts as outlined in the Compensation Plan at the time the promises were made. Rather, Panera argues that it is undisputed that it made the decision to cap the buyout payments years after the Compensation Plan was executed, and that Panera's corporate representative testified that, at the time the Compensation Plan was formed, Panera intended to pay buyouts in accordance with the written formula, whatever the amount. Panera also argues that Plaintiffs could not have relied on any alleged contractual promise regarding the buyout payments as a matter of law because Plaintiffs were at-will employees who had to fulfill certain conditions to receive a buyout payment and because Plaintiffs were not guaranteed any specific buyout amount, as Panera had the unilateral right to modify the store profit hurdle used to calculate the buyout payment. Finally, Panera argues that Plaintiffs cannot recover punitive damages on their classwide fraud claim as a matter of law because the Agreements included an express punitive damages waiver.

In response to Panera's motion for summary judgment on the classwide fraud claim, Plaintiffs argue that there is a material question of fact as to whether Panera intended to comply with its contractual promises at the time it made those promises.

Specifically, Plaintiffs point to Panera's testimony in this case regarding its "target total compensation" for JV GMs and regarding its "original intention" for the buyout program. Plaintiffs also point to Panera's corporate presentations regarding changes to the buyout program, which stated that the change was implemented because people were making "in excess of what the program intended." Plaintiffs argue that these facts support the inference that, at the time of entering the Compensation Plans, Panera had no intention of paying buyouts in amounts determined under Section 3(b) of the Compensation Plan.

Plaintiffs also argue that a factual question exists as to whether Panera intended to comply with its contractual promise in Section 5(d) of the Compensation Plan not to modify the Compensation Plan without Plaintiffs' signed written consent. Plaintiffs argue that, in this litigation, Panera has consistently stated that it considers Section 5(d) to be ineffective and non-binding, and that a member of Panera's JV GM board testified that, at the time of communicating the changes to the Compensation Plan to the JV GMs, Panera believed it did not need Plaintiffs' signed written consent. Plaintiffs argue that these facts give rise to an inference that, at the time of contracting, Panera did not intend to comply with Section 5(d).

Plaintiffs argue that they had a right to rely on these representations of their employer and that, as applied to this intentional tort, any contractual waiver of punitive damages is unenforceable under Missouri law.

Next, Panera seeks summary judgment on Boswell and Lutton's individual claims for fraud and unjust enrichment (Counts III and IV), which seek to apply Panera 2.0 profit credits to their respective buyout payments. As to the individual fraud claims,

Panera argues that the representation by Panera CEO Shaich on which Boswell and Lutton allegedly relied—that these Plaintiffs would be "made whole"—was not sufficiently concrete to support a fraud claim. Even if this statement were sufficiently specific, Panera argues that there is no evidence Shaich knew the statement was false, and that the statement was admittedly *not* false because both Boswell and Lutton did receive Panera 2.0 credits in their monthly bonuses. Panera further argues that Boswell and Lutton could not have reasonably relied on such a statement because both Plaintiffs were required by virtue of their job duties to implement Panera 2.0 without regard to any verbal promise of profit credits and because both Plaintiffs believed that the buyout payment calculation could not be altered absent signed written consent.

As to the unjust enrichment claims, Panera argues that, as a matter of law, Panera was not unjustly enriched by virtue of Boswell and Lutton performing their required job duties. Panera also argues that the terms of the buyout payment were governed by the Compensation Plan and that where the parties have entered into an express contract, unjust enrichment does not apply.

Plaintiffs oppose Panera's motion for summary judgment on Boswell and Lutton's individual claims. As to the individual fraud claims, Plaintiffs argue that there is a material question of fact as to whether Shaich knowingly falsely represented that Boswell and Lutton would be "made whole" through a "profit credit" applied to buyout. Plaintiffs argue that Panera's testimony that applying Panera 2.0 profit credits to buyout payments "was not part of the original discussions" gives rise to an inference that Panera did not intend to comply with Shaich's representations at the time the representations were made.

Plaintiffs also argue that whether Boswell and Lutton could reasonably rely on Shaich's verbal representations, notwithstanding the written terms of the Compensation Plan, is a matter for the jury to decide. As to the unjust enrichment claims, Plaintiffs argue that a factual question exists as to whether implementing Panera 2.0 was simply part of Boswell and Lutton's ordinary job duties or whether it conferred an additional benefit on Panera.

Finally, Plaintiffs move for summary judgment on the following affirmative defenses pleaded by Panera: statute of limitations, mutual mistake, accord and satisfaction, novation, waiver, estoppel, laches, commercial frustration, antecedent breach, lack of consideration, and statute of frauds. Panera does not contest Plaintiffs' motion as to the defenses of statute of limitations, mutual mistake, and accord and satisfaction. The Court will therefore grant Plaintiffs' motion as to these defenses.

Panera's novation, waiver, estoppel, and laches defenses are all asserted against Plaintiffs' contract claim and are all based on the class members' alleged failure to raise concerns about the buyout cap prior to receiving their capped buyout payments. Plaintiffs argue that the novation and waiver defenses fail as a matter of law because they contradict Section 5(d) of the Compensation Plan, which precludes modification or waiver in the absence of a writing signed by the party against whom the modification or waiver is sought to be enforced. Additionally, Plaintiffs argue that Panera's novation defense fails for the reasons discussed above relating to the statute of frauds, lack of consideration, and the illusory nature of Panera's promise. Plaintiffs also argue that Panera's waiver defense fails because waiver cannot be implied by the class members' conduct occurring before the breach.

Plaintiffs argue that Panera's estoppel defense fails because the class members' silence does not amount to a concealment of material facts and because Panera has not provided evidence that it relied upon or was injured by such silence. As to Panera's laches defense, which is asserted solely against Plaintiffs' breach of contract claim, Plaintiffs argue that laches does not apply because Plaintiffs filed their claims within the statute of limitations.

Next, Plaintiffs argue that Panera's commercial frustration defense fails as a matter of law because the event relied upon by Panera—changing business conditions—was not so unforeseeable as to excuse Panera's performance.

Plaintiffs also argue that Panera's defense of antecedent breach, which as discussed above is based on a few class members' alleged failure to satisfy conditions precedent to receiving a buyout, fails because the conditions relied upon by Panera are not in fact conditions precedent and because even if they were, their performance is excused because it was prevented or hindered by Panera.

Plaintiffs argue that Panera's lack-of-consideration defense fails because the class members' signed agreement to the terms of the Compensation Plan provided consideration for that Plan.

Finally, Plaintiffs argue that Panera's statute of frauds defense, which Panera asserts solely as to Boswell and Lutton's individual claims and solely in the event that the Court finds that the Compensation Plan is subject to the statute of frauds, does not apply to tort claims.

The Court will address Panera's affirmative defenses in the context of the claims

to which they apply.

## DISCUSSION

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall be entered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant 'bears the initial responsibility of informing the district court of the basis for its motion,' and must identify 'those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact.'" *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Material facts are those "that might affect the outcome of the suit under the governing law," and a genuine material fact is one such that "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Courts must view facts in the light most favorable to the non-moving party and resolve all doubts against the moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

## Cross Motions on Plaintiffs' Contract Claim Against Panera, LLC (Count I)

### 1. Enforceability of the Compensation Plan and Panera's Attempted Novation

As an initial matter, the Court must decide whether the Compensation Plan constitutes a valid contract. In this diversity case governed by Missouri law, the Court is "bound by the decisions of the Supreme Court of Missouri" and will "follow decisions from the intermediate state courts when they are the best evidence of Missouri law." *Gray v. FedEx Ground Package Sys., Inc.*, 799 F.3d 995, 999 (8th Cir. 2015) (citations

20

omitted).

Under Missouri law, "[a] valid contract contains the essential elements of 'offer, acceptance, and bargained for consideration.'" *Holmes v. Kansas City Mo. Bd. of Police Comm'rs ex rel. Its Members*, 364 S.W.3d 615, 622 (Mo. Ct. App. 2012) (quoting *Johnson v. McDonnell Douglas Corp.*, 745 S.W.2d 661, 662 (Mo. 1988)).

In a bilateral contract, "the offer and acceptance are in the form of mutual promises, and each party is both a promisor and promisee." *Coffman Indus., Inc. v. Gorman–Taber Co.,* 521 S.W.2d 763, 769 (Mo. Ct. App. 1975). In that case, "the mutual promises imposing some legal duty or liability on each promisor" constitute the consideration. *Sumners v. Serv. Vending Co.,* 102 S.W.3d 37, 41 (Mo. Ct. App. 2003).

In a unilateral contract, "performance is based on the wish, will, or pleasure of one of the parties." *Cook*, 967 S.W.2d at 657. The promisor "does not receive a promise as consideration for his or her promise, . . . but when the promisee performs, consideration is supplied, and the contract is enforceable to the extent performed." *Id.* "An offer to make a unilateral contract is accepted when the requested performance is rendered." *Id.*

Although other jurisdictions have come to different conclusions, the Supreme Court of Missouri has held that a promise of "continued at-will employment is not valid consideration [for a bilateral contract] because the employer makes no legally enforceable promise to do or refrain from doing anything it is not already entitled to do."[7]

---

[7]     The Court recognizes that, prior to the Supreme Court of Missouri's decision in *Baker v. Bristol Care, Inc.*, 450 S.W.3d 770 (Mo. 2014), the Eighth Circuit interpreted Missouri law to hold that continued at-will employment could constitute consideration for an enforceable, bilateral contract. *See, e.g., Berkley v. Dillard's Inc.*, 450 F.3d 775,

*Baker v. Bristol Care, Inc.*, 450 S.W.3d 770, 775 (Mo. 2014).  Thus, neither "continued

at-will employment *nor the incidents of that employment* provide consideration"

supporting a contractual obligation.  *Id.* at 776 (emphasis added); *see also Morrow v.*

*Hallmark Cards, Inc.*, 273 S.W.3d 15, 26 (Mo. Ct. App. 2008) (holding that the "terms

and conditions" of at-will employment "are not contracts enforceable at law" because

"[e]mployment-at-will is not a *legally enforceable employment relationship* [in that] it is

terminable at the will of either party, on a moment-by-moment basis").  As a result,

Missouri courts hold that "[i]n at-will employment, either party can announce at any time

that there are new conditions on either working or on providing work.  The other can say

yes or no.  When the employment ends, so do the duties[.]"  *Morrow*, 273 S.W.3d at 26.

      Although *Morrow*, *Baker*, and their progeny all considered the validity of

arbitration agreements, these courts arrived at their holdings as a matter of general

principles of contract law.[8]  *See Morrow*, 273 S.W.3d at 21 ("In determining whether the

parties have entered into a valid agreement to arbitrate, the usual rules of state contract

---

777 (8th Cir. 2006).  But in *Baker*, the Missouri high court expressly rejected that
approach.  *Baker*, 350 S.W.3d at 775 (explicitly rejecting the approach taken in *Berkley*
and its progeny and noting that the court instead "adopts the analysis employed by
*Morrow* and subsequent court of appeals cases, which hold that continued at-will
employment is not valid consideration to create an enforceable contract").  On this
question of state law, the Court is bound by the decision of the Supreme Court of
Missouri.  *See Gray*, 799 F.3d at 999.

[8]     As Panera notes, there is another line of Missouri cases holding that an offer of
continued at-will employment may be valid consideration for an employee's covenant not
to compete.  However, *Morrow* distinguished those cases and explicitly restricted their
holdings to the area of non-compete clauses, which are "are not true creatures of contract
law."  *Morrow*, 273 S.W.3d at 28.

law and canons of contract interpretation apply."); *Baker*, 450 S.W.3d at 775 (adopting the reasoning of *Morrow*).

Plaintiffs assert that the lack of consideration provided by continued at-will employment presents a problem for Panera's novation defense. But perhaps more importantly, it presents a problem for Plaintiffs' affirmative breach of contract claim. Plaintiffs assert that the consideration for the Compensation Plan was the class members' promises to serve as JV GMs with managerial responsibilities for Panera's cafes pursuant to the terms of the Plan. But Plaintiffs concede that this responsibility was at the will of the class members, a fact of significance under Missouri law. In other words, at the time of signing the Compensation Plans, the class members were just as free to quit in the next moment as Panera was to fire them. "Continued employment" as JV GMs, with the attendant duties of that position, "was neither *promised . . . nor received . . .* at the time the alleged contract was formed." *Morrow*, 273 S.W.3d at 27.

Plaintiffs also assert that consideration for the Compensation Plan was provided by way of the other terms of the Compensation Plan, such as the JV GMs' promises not to disclose Panera's confidential information and to be governed by Missouri law for any disputes arising under the Compensation Plan. Plaintiffs' position finds support in the dissent in *Baker*, which noted that there was a whole "collection" of mutual promises made in the at-will employment agreement in that case, in addition to the disputed promise to arbitrate, and that all of these contemporaneous promises were given exchange for the aggregate benefits and detriments to each party. *Baker*, 450 S.W.3d at

782-83 (Wilson, J., dissenting).[9] Nevertheless, the majority in *Baker* found that these "various promises that the parties exchanged were all incidents of the [employee's] continued at-will employment" and that *neither* "continued at-will employment *nor the incidents of that employment*" provided consideration for a binding bilateral contract. *Id.* at 776 (emphasis added). As discussed above, the *Baker* court did not expressly limit its holding to the arbitration context, and the Court is bound by its decision. Accordingly, the Court finds that the Compensation Plan was not a binding bilateral contract.

Instead, the Court finds that Panera's promise to pay a buyout according to the terms of the Compensation Plan in return for the class members' continued at-will employment according to the same terms was an offer for a unilateral contract. As noted above, under Missouri law, "[a] promise to pay a bonus in return for an at-will employee's continued employment is an offer for a unilateral contract which becomes enforceable when accepted by the employee's performance." *Cook*, 967 S.W.2d at 657. The rule is well established in Missouri. *See Nilsson v. Cherokee Candy &Tobacco Co.*, 639 S.W.2d 226, 228 (Mo. Ct. App. 1982) (finding that, in an at-will employment relationship, "no *promise* was made by plaintiff in return for defendants' promise [to pay a bonus]" but that the "[p]laintiff's *performance* in return for defendants' promise constituted an unilateral contract"); *Croskey v. Kroger Co*., 259 S.W.2d 408, 412 (Mo.

---

[9] These mutual promises included promises similar to those contained in the Compensation Plan: for example, promises by the employer to promote the employee, to pay her a bonus if specified financial targets were met, and to provide her with living accommodations and utilities; promises by the employee not to disclose the employer's confidential information or to interfere with the employer's relationships; and mutual promises to abide by a particular set of arbitration rules. *Baker*, 450 S.W.3d at 785-86 (Wilson, J., dissenting).

Ct. App. 1953) ("[W]here the employment is for an indefinite period, but the employee enters upon or continues in the service under an offer of a bonus if he remains therein for a certain time, his service . . . constitutes an acceptance of the offer of the employer to pay the bonus, [which] may be enforced by the employee.").

A unilateral contract becomes enforceable when accepted by the employee's performance. *Cook*, 967 S.W.2d at 657. Before acceptance, the promise by the employer is merely an offer, which is freely revocable until the time that the offeree has made "substantial performance." *Id.* But as soon as the offeree has rendered a substantial part of the requested performance, the offeror may no longer revoke or modify its offer. *Coffman Indus.*, 521 S.W.2d at 772. The offeree is entitled to complete performance under the original offer, and if the offeree does so, he may enforce the offeror's promise. *Id.*

> The rationale for this rule is given in Restatement of Contracts, [§] 45, Comment b: The main offer includes a subsidiary promise, necessarily implied, that if part of the requested performance is given, the offeror will not revoke his offer, and that if tender is made it will be accepted. Part performance or tender may thus furnish consideration for the subsidiary promises.

*Id*.

The performance tendered to preclude revocation "must be part of the actual performance invited." Restatement (Second) of Contracts § 45 cmt. f. Where such part performance is provided, "the offeree is not bound to complete performance. The offeror alone is bound, but his duty of performance is conditional on completion of the offeree's

performance. If the offeree abandons performance, the offeror's duty to perform never arises." *Id.* cmt. e.

The performance invited for the Compensation Plan's buyout offer in this case is set out in Section 3(a) of the Plan, and required only that "as of the date on which the [buyout] payment is made," the class members still (i) be an employee of Panera, (ii) be performing the duties of the position currently entitled JV GM, and (iii) not be in breach of any provision of the Agreement or any other obligation owed to Panera. The date on which the buyout payment was to be made was set for approximately five years from the date the Compensation Plan was executed. If this performance was completed, the Compensation Plan provided that the buyout payment would be calculated based on a predetermined formula set forth in Section 3(b), which turned on the cafes' profitability in the last two years of the five-year period.

It is undisputed that all class members performed under the Compensation Plan for at least one year by the time Panera announced the buyout cap, and many had performed much longer. Panera argues that the performance requested for the buyout offer could not have begun until the final two years of the five-year period, because the buyout payment was calculated according to the cafes' profitability in those final two years. But, under the terms of the Compensation Plan, profitability in the final two years was merely the measure by which the amount of the buyout payment was calculated; it was not a condition of eligibility for a buyout payment.

To be eligible for a buyout payment, Plaintiffs need only have complied with the conditions set forth in Section 3(a), and the Court concludes that working for one year as

JV GMs before the buyout cap was announced, which they all did, constitutes substantial performance as a matter of law. At that point, the Compensation Plan's buyout offer was irrevocable. *See Ketchserside v. McLane*, 118 S.W.3d 631, 637 (Mo. Ct. App. 2003) (holding that evidence sufficiently demonstrated substantial performance under an offer for a unilateral contract to conduct an auction, where, at time of the attempted revocation, the offeree had inventoried and marketed items for auction even though he had not actually begun conducting auction); *Miller v. Dictaphone Corp.*, 334 F. Supp. 840, 842 (D. Or. 1971) (finding, as a matter of law, that an offeree substantially performed an offer for a unilateral contract for pension benefits, which required signature on an enrollment card and retirement after age 62, where, by the time of the attempted revocation, the offeree had signed an enrollment card and had worked for seven months out of the two and a half years necessary to reach age 62). Accordingly, Panera's attempt to modify the Compensation Plan's buyout offer in the first quarter of 2011 was ineffective. *See Cook*, 967 S.W.2d at 657.

Additionally, the Court notes that, even if it deemed the Compensation Plan a bilateral contract, enforceable upon its execution based on the parties' mutual promises as to the terms of the at-will employment, it would still find that Panera's attempt to novate the Compensation Plan was ineffective. This is because the attempted novation was not supported by consideration, or a promise to do something more than Panera was already legally obligated to do. *See Gross v. Diehl Specialties Int'l, Inc.*, 776 S.W.2d 879, (Mo. Ct. App. 1989) ("While consideration may consist of either a detriment to the promisee or a benefit to the promisor, a promise to carry out an already existing contractual duty does

27

not constitute consideration."); 66 C.J.S. Novation § 14 ("[W]here one is already legally bound by his or her contract to perform an obligation, a later agreement for the same consideration, modifying such obligation, does not effect a novation.").  In its announcement of the buyout cap, Panera simply offered to continue to employ the JV GMs at will, pursuant to the same terms it did previously, but for a smaller buyout payment.

Because the Court finds that Panera's attempted modification of the Compensation Plan's buyout offer was ineffective as a matter of law, the Court need not reach Plaintiffs' additional arguments, based on Section 5(d) of the Compensation Plan and the statute of frauds, that the attempted modification also failed because it was not in a signed writing.

**2. <u>Plaintiffs' Full Performance Under the Compensation Plan</u>**

Because the Compensation Plan's buyout offer was irrevocable by the time Panera attempted to modify it, Plaintiffs were entitled to a buyout payment under the terms of the Compensation Plan, provided that they completed performance.  As discussed above, full performance included satisfaction of the three conditions in Section 3(a) quoted above "as of the date on which the payment [was] made" to each class member.

Panera does not dispute that 64 out of the 67 class members provided full performance.  But Panera asserts that three class members, Snyder, Boswell, and JV GM 42, failed to satisfy one or more of Section 3(a)'s conditions.  The facts as to these class members' performance are largely undisputed, and the primary question is whether Panera, by considering these class members' performances under Section 3(a) and choosing to make a buyout payment in each (albeit, in a capped amount), accepted each

28

class members' acts as full performance. "There is good reason and authority for holding that whatever the parties see fit to accept as performance of the contractual obligations will be so regarded by the courts." *Woolfolk v. Jack Kennedy Chevrolet Co*., 296 S.W.2d 511, 514 (Mo. Ct. App. 1956). Even if there is not an acceptance in express terms, "the facts and circumstances [may] point inevitably to an acceptance, which by sound authority may be implied from conduct." *Robson v. United Pac. Ins. Co*., 391 S.W.2d 855, 862 (Mo. 1965) (finding that the defendant's acceptance and payment for the plaintiff's rock crushing services, albeit in a deficient amount, implied acceptance of the plaintiff's acts as full performance such that the plaintiff could recover the balance due on the contract). There is no dispute that Panera considered the class members' performances under Section 3(a) before making a buyout payment to each of them. And Panera has not asserted any facts suggesting that capping the buyout payments implied that Panera did not accept the class members' acts as full performance. Therefore, on this record, the Court finds that Panera's conduct implied acceptance of the class members' acts as full performance as a matter of law.

As Plaintiffs correctly note, Section 15 of the Agreement does not alter the Court's analysis. Section 15 merely states that the failure of a party to enforce a condition at one time shall not be deemed a waiver of that condition "for any future time or times." (Doc. No. 166 at 4.) But Plaintiffs are not seeking to apply Panera's waiver at the time of making the capped buyout payments to any future performance of Section 3(a) by JV GMs. Rather, Plaintiffs merely assert that, by choosing to make the capped buyout payments to all class members, including the three class members at issue, Panera

accepted the acts of those class members *at the time* as full performance. The Court, too, will regard all class members' performance as complete as a matter of law, satisfying their prima facie claim for a buyout payment according to the terms of the Compensation Plan.[10]

### 3. **Panera's Waiver and Estoppel Defenses**

Panera asserts that a question of fact exists as to whether Plaintiffs waived, or were estopped from asserting, a breach of contract claim based on the capped buyout payments because they continued to work without objection after Panera announced the buyout cap.

"A waiver is the intentional relinquishment of a known right." *Acetylene Gas Co. v. Oliver*, 939 S.W.2d 404, 409 (Mo. Ct. App. 1996). "To rise to the level of a waiver, the conduct must be so manifestly consistent with and indicative of an intention to renounce a particular right or benefit that no other reasonable explanation of [the] conduct is possible." *Id.* (citation omitted). Similarly, "[e]quitable estoppel arises from the unfairness of allowing a party to belatedly assert rights if he knew of those rights but took no steps to enforce them until the other party has, in good faith, been disadvantaged by changed conditions." *Comens v. SSM St. Charles Clinic Med. Grp., Inc.*, 258 S.W.3d 491, 496 (Mo. Ct. App. 2008). The doctrine "is not favored in the law and it will not be invoked lightly." *Id.*

---

[10]    For this reason, the Court will also grant Plaintiffs' motion for summary judgment on Panera's affirmative defenses of lack of consideration and antecedent breach. Although Plaintiffs bear the burden of demonstrating consideration and performance of any conditions precedent with respect to their contract claim, the Court finds that they have done so as a matter of law.

The rationale for these doctrines is the equitable notion that a party should not be allowed "to benefit from a contract he disaffirms." *Long v. Huffman*, 557 S.W.2d 911, 915-16 (Mo. Ct. App. 1977). In other words, "one who waives a breach of the contract cannot set it up in justification of his own breach." *Id. See also Supermarket Merch. & Supply, Inc. v. Marschuetz*, 196 S.W.3d 581, 587 (Mo. Ct. App. 2006) ("[A]s a general rule an employee cannot repudiate the unfavorable terms of a modified contract when he has claimed the benefits of continued employment under it.") (citation omitted). But Plaintiffs are not attempting to repudiate any of their contractual obligations. Rather, they are only asserting that Panera has breached its obligations. Plaintiffs have not taken any inconsistent positions. *See Comens*, 258 S.W.3d at 498 (holding that where the employee was "not attempting to avoid or repudiate any of his obligations under the Employment Agreement" but was rather only asserted "that [his employer] has repudiated, or breached, its obligations under the Employment Agreement," the employee had not taken inconsistent positions to support an estoppel defense).

In announcing the buyout cap, it was Panera who attempted to repudiate its then-irrevocable buyout offer. At that time, Panera's performance—the buyout payment—was not yet due because Plaintiffs had not completed their own performance under the Compensation Plan. A "promisor's renunciation of a contractual duty before the time fixed in the contract for performance is a repudiation," which "ripens into a breach prior to the time for performance *only if the promisee elects to treat it as such*." *Franconia Assocs. v. United States*, 536 U.S. 129, 143 (2002) (emphasis added). "The promisee, if he pleases, may treat the notice of intention as inoperative, and await the time when the

contract is to be executed, and then hold the other party responsible for all the consequences of nonperformance." *Roehm v. Horst*, 178 U.S. 1, 10-11 (1900). "[I]n that case he keeps the contract alive for the benefit of the other party as well as his own; he remains subject to all his own obligations and liabilities under it[.]" *Id.*

Because Panera's performance under the Compensation Plan was not yet due at the time it announced the buyout cap, Plaintiffs were permitted to complete their own performance under the Compensation Plan's buyout offer, wait for Panera's performance in the form of its buyout payments, and hold Panera responsible for any deficiencies in that payment. By continuing to work, Plaintiffs merely did what they were required to do to enforce Panera's original buyout offer. As a matter of law, Plaintiffs' conduct did not amount to a waiver or an estoppel.

### 4. **Panera's Laches Defense**

Under Missouri law, "laches is purely a creation of equity, and is only to be invoked by the defendant in a case where the plaintiff appeals to equity and seeks the enforcement of an equitable right." *Rabius v. Brandon*, 257 S.W.3d 641, 647-48 (Mo. Ct. App. 2008). Laches is "not applicable to actions at law." *Id.*

Because Panera asserts its laches defense solely as to Plaintiffs' contract claim, which does not seek to enforce an equitable right, Panera's laches defense fails.

### 5. **Panera's Commercial Frustration Defense**

The doctrine of commercial frustration provides that "if the happening of an event not foreseen by the parties and not caused by or under the control of either party has destroyed or nearly destroyed either the value of the performance or the object or purpose

of the contract, then the parties are excused from further performance." *Clean Unif. Co.*

*St. Louis v. Magic Touch Cleaning, Inc.*, 300 S.W.3d 602, 609 (Mo. Ct. App. 2009)

(citation omitted). "However, if the supervening event was reasonably foreseeable, the

parties should have provided for its occurrence in the contract and the absence of such

provision indicates an assumption of risk by the promisor." *Id.*

The Court agrees with Plaintiffs that the change in business conditions that Panera

asserts necessitated the buyout cap was reasonably foreseeable and, as such, does not

excuse Panera's performance. *See First Bank v. Fischer & Frichtel, Inc.*, No. ED95297,

2011 WL 3558118, at *6 (Mo. Ct. App. Aug. 9, 2011) (finding that a downturn in the

housing market and credit market, even severe, is reasonably foreseeable, and therefore

insufficient to support a commercial frustration defense).

In sum, the Court finds that Plaintiffs are entitled to summary judgment on their

breach of contract claim (Count I) against Defendant Panera, LLC. As suggested by the

parties, the Court will ask for supplemental briefs as to the amount of damages on this

claim.

**Panera's Motion on Classwide Fraud Claim (Count II)**

The elements of a fraud claim under Missouri law are: "(1) a false, material

representation; (2) the speaker's knowledge of its falsity or his ignorance of the truth; (3)

the speaker's intent that it should be acted upon by the hearer in the manner reasonably

contemplated; (4) the hearer's ignorance of the falsity of the representation; (5) the

hearer's reliance on its truth; (6) the hearer's right to rely thereon; and (7) the hearer's

consequent and proximately caused injury." *Scott Salvage Yard, LLC v. Gifford*, 382

S.W.3d 134, 137 (Mo. Ct. App. 2012).

"It is well settled in Missouri that a contractual promise made without the present intention to perform is a misrepresentation sufficient to demonstrate fraud." *Commonwealth Land Title Ins. Co. v. Miceli*, No. ED 101473, 2015 WL 1915242, at *11 (Mo. Ct. App. Apr. 28, 2015) (citation omitted); *see also Scott Salvage Yard*, 382 S.W.3d at 137.

However, Plaintiffs have not offered any evidence of Panera's intent not to perform their contractual promises *at the time the promises were made*. At most, as to Panera's promise to pay a buyout in accordance with the terms of the Compensation Plan, Plaintiffs offer evidence that Panera anticipated that the buyout payments would fall within a target range and that the buyout payments ended up being higher than expected. But Plaintiffs have offered no evidence that, when the Compensation Plan was entered, Panera intended to refrain from paying any buyout exceeding the target range. Rather, the evidence shows that, at the time it entered the Compensation Plan, Panera intended to comply with its promise to pay buyouts according to the Plan's formula, but that Panera later changed its mind when it saw the possible magnitude of the buyout payments.

Likewise, as to Panera's promise not to modify the Compensation Plan except by signed writing, Plaintiffs offer evidence that after 2010, when Panera attempted to modify the Compensation Plan, Panera did not feel bound by the no-oral-modification clause. But Plaintiffs offer no evidence that, when the Compensation Plan was formed in 2007, Panera intended not to comply with the no-oral-modification clause.

In short, Plaintiffs' evidence supports a breach of contract claim, but not a fraud

claim. The Court will grant Panera's motion for summary judgment on Plaintiffs classwide fraud claim (Count II).

**Panera's Motion on Boswell and Lutton's Individual Claims (Counts III and IV)**

The parties do not discuss the choice of law for Boswell and Lutton's individual claims for fraud and unjust enrichment. But as both parties cite Missouri law in their briefs as to this claim, the Court will rely on Missouri law as well.

**1. Fraud**

The elements of a fraud claim under Missouri law are recited above. Although fraud may be inferred from the facts and circumstances, "intent not to perform cannot be shown solely by the speaker's nonperformance[.]" *Jacobs Mfg. Co. v. Sam Brown Co.*, 19 F.3d 1259, 1264 (8th Cir. 1994) (applying Missouri law).

As with the classwide fraud claim, Boswell and Lutton have not offered any evidence of Panera's fraudulent intent not to perform at the time the alleged representations about applying the Panera 2.0 profit credit to the buyout payments were made. The most these Plaintiffs offer is Panera's testimony that protection of the buyout payments was not part of the "original discussions" regarding the profit credit. This testimony may create a factual dispute as to whether Panera (through Shaich) made any representation about applying the profit credit to the buyout payments in the first place. But assuming that such a representation was made, for purposes of this motion, the testimony does not suggest that the statement was made *deceptively*, with the present intent not to apply the profit credit to the buyout payments. Rather, Boswell and Lutton admit that, at the time of Shaich's alleged representation, Panera had not yet determined

what amount of profit credits might be provided and there was no plan in place regarding the impact of Panera 2.0 on the JV GM buyout payments.   These facts do not give rise to a fraud claim as a matter of law.  Therefore, the Court will grant Panera's motion for summary judgment on Boswell and Lutton's individual fraud claim.

## 2. __Unjust Enrichment__

"To establish the elements of an unjust enrichment claim, the plaintiff must prove that (1) he conferred a benefit on the defendant; (2) the defendant appreciated the benefit; and (3) the defendant accepted and retained the benefit under inequitable and/or unjust circumstances." *Howard v. Turnbull*, 316 S.W.3d 431, 436 (Mo. Ct. App. 2010).  "The essence of unjust enrichment is that the defendant has received a benefit that it would be inequitable for him to retain." *Jennings v. SSM Health Care St. Louis*, 355 S.W.3d 526, 536 (Mo. Ct. App. 2011).[11]

Viewing the record in the light most favorable to Boswell and Lutton, the Court finds that these Plaintiffs have presented sufficient evidence to survive summary

---

[11]    Panera correctly asserts that "[i]f the plaintiff has entered into an express contract for the very subject matter for which he seeks recovery, unjust enrichment does not apply, for the plaintiff's rights are limited to the express terms of the contract." *Howard*, 316 S.W.3d at 436.  But neither party asserts that the subject matter for which Boswell and Lutton seek individual recovery—the roll-out of Panera 2.0 in exchange for a profit credit—was the subject of an enforceable contract.  The mere fact that representations were made with respect to the effect of Panera 2.0 on the already existing Agreement and Compensation Plan does not bring those representations within the scope of the Agreement and Compensation Plan so as to displace a claim of unjust enrichment. Boswell and Lutton may proceed on a quasi-contractual theory with respect to this subject matter. *See Royal Forest Condo. Owners's Ass'n v. Kilgore*, 416 S.W.3d 370, 373 (Mo. Ct. App. 2013) ("An action for unjust enrichment is based on an implied or quasi-contractual obligation.").

judgment on their unjust enrichment claim. Specifically, Boswell and Lutton have presented sufficient evidence to support a finding that, by rolling out the costly and experimental Panera 2.0 in their respective stores, they conferred a benefit upon Panera; that this benefit was conferred at Panera's request and following an oral promise by Panera to provide Boswell and Lutton with profit credits to protect their buyout payments; and that it would be inequitable for Panera to retain that benefit without providing Boswell and Lutton their promised profit credits. *See id.* (finding that the plaintiff stated an unjust enrichment claim by pleading that he conferred a benefit on the defendant by remaining employed throughout a transition period, at the defendant's request and following an oral promise by the defendant to provide the plaintiff with severance, and that the defendant unjustly retained the benefit of the plaintiff's continued employment without compensating him his promised severance). This is particularly true considering that Panera subsequently began providing the disputed profit credits to the buyout payments of other JV GMs who implemented Panera 2.0.

Panera's statute of frauds defense against these individual unjust enrichment claims fails as a matter of law. Even assuming, *arguendo*, that the statute of frauds would have applied to a contract claim by Boswell and Lutton (had they chosen to pursue one), it does not apply to quasi-contract claims like unjust enrichment. *See Consol. Products Co. v. Blue Valley Creamery Co*., 97 F.2d 23, 27 (8th Cir. 1938) (applying Missouri law and noting that "[i]f a contract is unenforceable by reason of the statute of frauds, the party who has performed can recover the value of his performance on the theory of quasi-contract, since otherwise he would be left without remedy.").

Accordingly, Court will deny Panera's motion for summary judgment on Boswell and Lutton's unjust enrichment claim (Count IV) and will allow this claim to proceed to trial.

## CONCLUSION

For the reasons set forth above,

**IT IS HEREBY ORDERED** that that Defendants' motion for summary judgment is **GRANTED in part** and **DENIED in part**.  Defendants' motion is **GRANTED** as to Plaintiffs' classwide breach of contract claim (Count I) against Panera Bread Company only, Plaintiffs' classwide fraud claim (Count II) against both Defendants, and named Plaintiffs Mark Boswell and David Lutton's individual fraud claims (Counts III) against both Defendants.  The motion is **DENIED** as to Plaintiffs' classwide breach of contract claim (Count I) against Panera, LLC and as to Boswell and Lutton's individual unjust enrichment claims (Count IV) against both Defendants.  (Doc. No. 133.)

**IT IS FURTHER ORDERED** that Plaintiffs' second amended motion for summary judgment on their classwide breach of contract claim (Count I) is **GRANTED** as to Plaintiffs' claim against Panera, LLC, and **DENIED** as to Plaintiffs' claim against Panera Bread Company.  (Doc. No. 205.)

**IT IS FURTHER ORDERED** that, within **seven (7) days** of the date of this Order, the parties shall submit supplemental briefs regarding whether the parties stipulate as to the amount of damages on Plaintiffs' classwide breach of contract claim against Panera, LLC, or whether a trial on this issue is necessary.

**IT IS FURTHER ORDERED** that Plaintiffs' original and first amended motions

38

for summary judgment on their classwide breach of contract claim (Count I) are

**DENIED as moot**.  (Doc. Nos. 108 & 173.)

 **IT IS FURTHER ORDERED** that Plaintiffs' motion for summary judgment on

Defendants' affirmative defenses is **GRANTED**.  (Doc. No. 110.)


_____
AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE


Dated this 24th day of March, 2016.