UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| MARK BOSWELL, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 4:14-CV-01833-AGF |
| | ) | |
| PANERA BREAD COMPANY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

This matter is before the Court following a bench trial to address the only remaining count in Plaintiffs' amended complaint: Plaintiffs Mark Boswell and David Lutton's (together, "Plaintiffs'") individual unjust enrichment claims (Count Four). These claims arise out of the alleged promise of Defendants' CEO, Ron Shaich, to apply profit credits to Plaintiffs' profit-based bonuses, known as "buyouts," in order to offset the significant costs incurred in implementing and testing a new operating system in the cafes for which Plaintiffs served as Joint Venture General Managers ("JV GMs"). Plaintiffs assert that they implemented the new system in reliance on such promise, but were not provided profit credits to their buyouts, and that as a result, Defendants were unjustly enriched. As damages, Plaintiffs seek what they assert is the additional amount of buyout they would have received had the promised profit credits been applied.

The following findings of fact and conclusions of law are entered based on the entire record, including the trial testimony and exhibits. As set forth below, the Court finds that Defendants are entitled to judgment on the unjust enrichment claims.

## FINDINGS OF FACT

At all relevant times, Plaintiffs were employed as JV GMs of Panera cafes in the Charlotte, North Carolina market. In general, Defendants operated their cafes with general managers ("GMs") and JV GMs. Both GMs and JV GMs were at-will employees responsible for managing all aspects of their respective cafes and were ultimately accountable for the profits and sales in their cafes, though costs and expenses were borne by Defendants. The JV GM program included three compensation components set out in a Compensation Plan between the parties: a base salary, monthly bonuses known as "payouts," and a long-term, profit-based incentive bonus known as a "buyout," payable after five years. The GMs received only a base salary and monthly payouts. The buyout required the JV GM to remain in his or her position for five years, and the amount of the buyout turned on the profitability of the JV GM's cafe in the last two years of the five-year period. The last two years of Plaintiffs' five-year periods were March 2012 to February 2013 ("Year Four"), and March 2013 to February 2014 ("Year Five").

In January or February 2013, when Plaintiffs were nearing Year Five, they learned that Defendants were considering changes to the ordering system in the Panera cafes, such as installing kiosks. In May 2013, Plaintiffs learned that Charlotte had been chosen as the test market for a new operating system known as "Panera 2.0" that would include (1) table service, (2) the kiosk ordering system mentioned above for customers to use throughout the store, and (3) educating customers on how to use the computers. Plaintiffs were told at this time that Panera 2.0 would require a significant increase in staffing levels and operating costs for a period of several months, primarily for labor but also for

technology and marketing. Plaintiffs acknowledged at trial that they were required to implement Panera 2.0 if they wished to remain employed, but as at-will employees, they could have quit rather than implement Panera 2.0.

Plaintiffs began implementing Panera 2.0 in May 2013 by hiring and training staff to meet the staffing levels required for Panera 2.0. Thus, Plaintiffs' cafes began incurring increased labor costs for Panera 2.0 in May 2013. These costs were paid by Defendants, but any changes to the cafes' profitability could have affected Plaintiffs' profit-based compensation.

On July 21, 2013, Defendants held a meeting for JV GMs and GMs regarding Panera 2.0. The meeting was held in Charlotte, North Carolina, and Defendants' CEO, Shaich, and other executives attended the meeting. During a question-and-answer session at the end of the meeting, Lutton asked a question about the increased costs of Panera 2.0 and the effect of these costs on the managers' profitability. Shaich responded that the managers should not worry because Shaich was giving them his "personal guaranty" that they would be "made whole."

The GMs who attended the July 21st meeting were not eligible for a buyout. And although Shaich knew that some JV GMs attending the meeting were due to receive buyouts soon, both Plaintiffs admitted at trial that Shaich did not specifically say that these JV GMs would receive any sort of profit credit applied to their buyouts. Boswell further admitted that no representative of Defendant ever told him that he would receive a profit credit applied to his buyout.

In fact, shortly after the meeting, Defendants began providing profit credits to the

monthly payouts of Plaintiffs and the other JV GMs[1] who implemented Panera 2.0. Defendants calculated these monthly payout profit credits with the goal of ensuring that the JV GMs' monthly payouts equaled their average payouts from the prior year, before they implemented Panera 2.0.

At some point, Boswell received documentation regarding the profit credits for JV GMs who implemented Panera 2.0, but the only documentation he ever received in this regard stated that profit credits would be applied to monthly payouts. This documentation said nothing about profit credits being applied to buyouts, and Boswell never objected on this basis. On September 27, 2013, Lutton had a call with Panera regarding application of Panera 2.0 profit credits to monthly payouts, but buyout credits were not discussed and Lutton never asked about buyout credits.

Both Plaintiffs received Panera 2.0 profit credits to their monthly payouts, but neither attempted to track or calculate the amount of these credits.

Boswell's cafe went live with Panera 2.0 on September 23, 2013, and Lutton's did so on December 17, 2013. Boswell's cafe's net sales increased from Year Four (March 2012 to February 2013) to Year Five (March 2013 to February 2014), but his operating costs also increased during this time, driving down his profits. Lutton's net sales remained fairly steady from Year Four to Year Five, but his operating costs increased during this time, thereby decreasing his profits. Both Plaintiffs believed that implementing Panera 2.0 in their cafes contributed to their increased costs in Year Five,

---

[1] The record is unclear whether GMs also received these profit credits to their monthly payouts.

but they did not establish with certainty that the increase was solely due to Panera 2.0. Moreover, both Plaintiffs acknowledged that their cafes did not begin incurring the Panera 2.0 costs until two months into Year Five (May 2013), and neither Plaintiff compared the change in his cafe's sales, costs, and profits by looking solely at the periods before and after implementing Panera 2.0.

Plaintiffs received their capped buyout payments in May 2014,[2] and these buyouts did not include a Panera 2.0 profit credit. Both Plaintiffs resigned from their employment in July 2014. Both Plaintiffs admitted that the reason they did not quit earlier was because they wanted to maintain their eligibility for a buyout, which required continued employment as a JV GM on the buyout date.

In the summer of 2014, sometime after June 15, 2014, Defendants made the decision to apply Panera 2.0 profit credits to the buyouts of other JV GMs who implemented Panera 2.0 in the last two years of their Compensation Plans. Thus, Vickie Snyder,[3] another JV GM who implemented Panera 2.0 in her cafe, received a Panera 2.0 profit credit to her buyout in September 2014. The parties did not submit evidence as to how these buyout credits were calculated. Neither Plaintiff raised the issue of Panera 2.0 buyout credits with Defendants before learning that Snyder had received such a credit to her buyout.

---

[2] In the first quarter of 2011, Defendants announced their decision to cap the buyout payments to JV GMs at $100,000, starting in January 2012, a modification this Court has since held to be unenforceable.

[3] Snyder is also a class representative for the classwide claims in this lawsuit, which were previously resolved by summary judgment.

As damages for their unjust enrichment claims, Boswell seeks $33,015 and Lutton seeks $42,455. Plaintiffs assert that these figures represent the amount by which their buyouts would have increased if their cafes had not incurred the costs of implementing Panera 2.0. Plaintiffs calculated these figures by applying the formula for buyouts listed in their Compensation Plan based on their cafes' Year-Four profits alone, instead of also taking into account their lower Year-Five profits. In interrogatory answers submitted earlier in the litigation, Plaintiffs offered two other damages calculations (in lower amounts), but though the calculations themselves are reflected, Plaintiffs offered no justification or explanation of these earlier calculations.

## **CONCLUSIONS OF LAW**

"To establish the elements of an unjust enrichment claim, the plaintiff must prove that (1) he conferred a benefit on the defendant; (2) the defendant appreciated the benefit; and (3) the defendant accepted and retained the benefit under inequitable and/or unjust circumstances." *Howard v. Turnbull*, 316 S.W.3d 431, 436 (Mo. Ct. App. 2010). "Demonstrating unjust retention of the benefit is the most significant element of unjust enrichment and also the most difficult to establish." *Jennings v. SSM Health Care St. Louis*, 355 S.W.3d 526, 536 (Mo. Ct. App. 2011). "One thing the courts consider is whether any wrongful conduct by the defendant contributed to plaintiff's disadvantage." *Hunt v. Estate of Hunt*, 348 S.W.3d 103, 111 (Mo. Ct. App. 2011). "The unjust retention of benefits occurs only when benefits are conferred (a) in misreliance on a right or duty, or (b) through a dutiful intervention in another's affairs, or (c) under constraint." *Id.*

Plaintiffs have consistently asserted that Defendants were unjustly enriched in this

6

case because they received the benefit of Plaintiffs' services in implementing the costly and experimental Panera 2.0; that this benefit was conferred in reliance upon an oral promise by Shaich to provide Plaintiffs with profit credits to protect their buyouts; and that it would be inequitable for Defendants to retain the benefit without providing Plaintiffs their promised profit credits. *See Jennings*, 355 S.W.3d at 536 (allowing an unjust enrichment claim to go forward on a similar theory). However, the evidence at trial established that neither Plaintiff implemented Panera 2.0 in reliance—or misreliance—on any purported right to a profit credit to his buyout. Both Plaintiffs admitted at trial that they began implementing Panera 2.0 months before receiving any purported promise by Shaich and that, in fact, neither Shaich nor any other representative of Defendants ever promised that a Panera 2.0 profit credit would be applied to their buyouts. Instead, Defendants' decision to apply Panera 2.0 profit credits to JV GM buyouts came after Plaintiffs received their buyouts. At most, Defendants may have promised Plaintiffs that Panera 2.0 profit credits would be applied to their monthly payouts, and Defendants fulfilled that promise. And apparently, Plaintiffs did not find these monthly credits important enough to track, further belying their assertions that profit credits played a key role in their decisions to implement Panera 2.0 instead of quitting their employment. Indeed, both Plaintiffs admitted that the reason they did not quit was not because of any promised profit credits but because they wanted to maintain eligibility for their buyouts. And of course, there is nothing "unjust" about Defendants electing to try a new operating system in some of their stores, especially where, as here, all increased expenses were paid by Defendants. Upon review of the evidence, the Court

7

concludes that if Defendants received a benefit from Plaintiffs' implementation of Panera 2.0, their retention of this benefit under the circumstances of this case is not unjust.

Moreover, Plaintiffs' have not established damages with sufficient certainty. The measure of damages for an unjust enrichment claim is "the amount of the enrichment which, as between the two parties, would be unjust for one party to retain." *White v. Pruiett*, 39 S.W.3d 857, 863 (Mo. Ct. App. 2001). Plaintiffs assert that, in this case, their damages are the amount by which their buyouts would have increased if they discounted the costs of implementing Panera 2.0. Assuming, *arguendo*, that Plaintiffs' measure is correct, Plaintiffs admittedly have not calculated their damages under it. Plaintiffs did not introduce into evidence the costs of implementing Panera 2.0 in their cafes. Rather, the damages figure they offered at trial reflected the costs their cafes incurred in Year Five as a whole, which included two months' worth of costs incurred before Plaintiffs began implementing Panera 2.0.

In short, the Court finds that Plaintiffs have failed to prove their unjust enrichment claims, and Defendants are entitled to judgment in their favor on Count Four.

**CONCLUSION**

For the reasons set forth above,

**IT IS HEREBY ORDERED** that judgment is entered on behalf of Defendants and against Plaintiffs on Count Four of Plaintiffs' Amended Complaint.

_Audrey G. Fleissig_
AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 17th day of May, 2016.